AMY J. LONGO (Cal. Bar No. 198304)
Email:  longoa@sec.gov
BRENT W. WILNER (Cal. Bar No. 230093)
Email:  wilnerb@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> ICOBOX and NIKOLAY EVDOKIMOV, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Nikolay Evdokimov resides in this district.

## **SUMMARY**

1.     This action concerns the unregistered offering and unregistered broker activities of securities through so-called "token sales" or "initial coin offerings" ("ICOs"), by Defendants ICOBox ("ICOBox") and Nikolay Evdokimov ("Evdokimov," collectively "Defendants").  Since August 2017, ICOBox and Evdokimov have engaged in both the unregistered offering of securities through a $14.6 million ICOBox token sale, as well as the unregistered broker activities related to securities offered by ICOBox's clients, exposing thousands of investors to risky investments without providing the necessary information and protections required by the federal securities laws.

2.     ICOBox proclaims to be a "Blockchain Growth Promoter and Business Facilitator for companies seeking to sell their products via ICO crowdsales"—in other words, an incubator for digital asset startups.  A self-described blockchain expert, Evdokimov, has acted as the company's co-founder, CEO, and "vision director," among other titles.  To raise funds to develop its newly formed enterprise, between August 9, 2017 and September 15, 2017, ICOBox offered and sold approximately $14.6 million worth of digital assets it called "ICOS" tokens to

COMPLAINT                                    2

over 2,000 investors in the United States and globally through the company's
website, https://icobox.io.

3.     ICOBox and Evdokimov told investors that the offering proceeds would
be used to cover the cost of providing ICOBox's planned services to digital asset
startups that could not afford them.  Defendants claimed that ICOBox would be
successful—and the ICOS tokens valuable—due to the efforts of ICOBox's
management team, who would curate potential digital asset projects and attract
"100+" clients per month.  As of the date of ICOBox's offering, ICOBox had yet to
support a single token sale to completion.

4.     According to ICOBox's promotional materials, the primary benefit to
ICOS token holders would be the ability to swap the ICOS tokens through ICOBox's
website for tokens issued by ICOBox's anticipated clients, at an average 75%
discount.  ICOBox also emphasized that the ICOS tokens would be immediately
transferable and would increase in value when the company placed the tokens on
various digital asset trading platforms.

5.     Defendants' ICOS offering followed the publication of the SEC's Report
of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:
The DAO (Exch. Act Rel. No. 81207) (July 25, 2017) (the "*DAO Report*"), which put
the digital asset industry on notice that many digital assets such as the ICOS tokens
are securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and subject to the
federal securities laws, including registration requirements.

6.     ICOBox and Evdokimov were well-aware of the *DAO Report* by the
time of the ICOS offering, publicly discussing its significance, including in an
interview with Reuters and in communications with potential investors.
Nevertheless, ICOBox did not register the ICOS offering or qualify for any
exemption from registration, instead claiming the ICOS tokens were not securities or
had an "exemption" because of an unspecified "utility."

7.      By not registering the ICOS offering, the company deprived investors of meaningful information that would be found in a registration statement that investors could use to assess the company's prospects.

8.      ICOBox's results turned out to be less rosy than its promotional materials forecast.  ICOBox has facilitated far fewer than 100 clients' token sales *total*—let alone 100 per month.  In addition, the company has discontinued the ability to swap ICOS tokens, rendering them useless.  ICOS tokens now trade, if at all, at approximately $2.41, a fraction of the offering purchase price—roughly $1/20^{th}$ of the average purchase price during the offering (and roughly $1/30^{th}$ of the highest price paid by investors during the final days of the ICO).

9.      Defendants also have provided unregistered broker services and continue to act as unregistered brokers in connection with ICOBox's clients' token sales.

10.     Although nowhere near as successful as predicted, Defendants did launch the ICOBox platform for fostering other companies' creation and sale of digital assets.  Since August 2017, ICOBox and Evdokimov have facilitated the token sales of over 30 clients, which have collectively raised over $650 million from investors.

11.     These facilitation services have included structuring, promoting, and soliciting investors for the clients' offerings.  If a client's token sale successfully raised funds, ICOBox charged the client success fees starting at 1.5% of the amount raised.

12.     The token sale conducted by at least one of these clients, Paragon Coin, Inc. ("Paragon"), constituted a securities offering under *Howey*.

13.     By actively soliciting and attracting investors to ICOBox's clients' securities offerings in exchange for transaction-based compensation without registering as or associating with a registered broker-dealer, Defendants engaged in unregistered broker activities that violated the federal securities laws.

14.     Defendants' conduct is ongoing—they continue to solicit clients for their facilitation services online, and even have broadened the scope of their services to support so-called "security token sales" or "STOs," reflecting that they will continue to flout the registration requirements absent judicial intervention.  STOs are a form of digital asset offering like ICOs, in which the token typically affords investors certain financial rights akin to a company stock, such as dividends.

15.     Defendants continue to expose investors to risky securities without complying with provisions of the federal securities laws designed to ensure investors have adequate information to evaluate such investments.

16.     By this conduct, Defendants have violated Sections 5(a) and 5(c) of the Securities Act for the unregistered offering of ICOS tokens, and Section 15(a) of the Exchange Act for the unregistered broker activities related to Defendants' clients' tokens.

17.     By this action, the SEC seeks to obtain disgorgement and penalties to redress Defendants' violations of the securities laws, as well as to enjoin Defendants' unlawful conduct to prevent further harm to investors.

## THE DEFENDANTS

18.     **ICOBox**, a privately-owned limited liability company formed in the Cayman Islands on June 23, 2017, claims to have offices located throughout the world including in San Francisco, California, and between 50 and 150 employees. ICOBox has never been registered with the SEC in any capacity, or associated with any registered broker-dealers; nor have any ICOBox securities offerings been registered with the SEC.

19.     **Nikolay Evdokimov**, age 37, resides in Beverly Hills, California. Evdokimov co-founded ICOBox and has served as the company's CEO since December 27, 2018.  Since the company's inception, he has consistently been the face of the company, frequently appearing on behalf of the company online, on social media, and in interviews to blockchain-centric media sites—and he continues to do so

to the present.  Evdokimov registered ICOBox's website domain name.  Evdokimov also has founded or been affiliated with several other blockchain-related companies, including currently serving as managing partner of a company that purports to provide OTC bitcoin trades worldwide for institutional investors and others. Evdokimov has never been registered with the SEC in any capacity or associated with any registered broker-dealers.

## OTHER RELEVANT ENTITY

20.     **Paragon Coin, Inc.**, an online entity formed in Singapore involved in developing blockchain technology for the cannabis industry, raised over $12 million through the sale of digital tokens to the general public including US-based investors in the form of "ParagonCoins" or "PRGs" between August 2017 and October 2017.

## THE ALLEGATIONS

A.     **Background on Digital Assets**

21.     An "initial coin offering" or "ICO" is a fundraising event in which an entity offers participants a unique "coin," "token," or "digital asset," in exchange for consideration, often in the form of virtual currency—most commonly bitcoin and ether—or fiat currency.  The tokens are issued and distributed on a "blockchain" or cryptographically secured ledger.  ICOBox's offering of ICOS tokens constituted an ICO, as did the token sales of many of its clients.

22.     A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a network and records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks."  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain.  The system relies on cryptographic techniques for secure recording of transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  Some blockchains can record what are called "smart contracts," which are, essentially, computer programs

designed to execute the terms of a contract when certain triggering conditions are met.

23.    As in the context of the ICOS token sale, ICOs are typically announced and promoted online, although other marketing may be employed.  Issuers including ICOBox often release a "white paper" describing the project and promoting the ICO, often in highly technical terms.  To participate, investors are generally required to transfer consideration to the issuer's address, bank account, digital "wallet," or other account.  After the completion of the ICO, the issuer will distribute its tokens to the participants' unique addresses on the blockchain.  ICOBox issued its ICOS tokens on the Ethereum blockchain.

24.    Issuers and individuals increasingly have been using blockchain technology in connection with raising capital for business purposes and projects.  And blockchain-enabled offerings are often targeted at retail investors in the United States and globally.  The overall size of the ICO market has grown exponentially.  It is reported that more than $20 billion was raised through ICOs from 2017 to 2019.  Issuers also have increasingly used "security token offerings" or "STOs," in which an entity offers participants asset-backed tokens through a mechanism similar to an ICO.

25.    After the initial sale by an issuer, tokens are sometimes transferred between users or listed on online trading platforms, which are sometimes colloquially referred to as "exchanges," where the tokens trade for other digital assets or fiat currencies.

26.    On July 25, 2017, two weeks before ICOBox started the public sale of the ICOS tokens, the SEC issued the *DAO Report*, which "advise[d] those who would use . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws," and concluded that the digital assets at issue in that matter were securities.

**B.** **Defendants' Sale of Unregistered Securities Through ICOBox's ICOS Token Offering**

    **1.** **An "ICO for ICOs"**

27.    On July 27, 2017, ICOBox announced via social media and its website that it would be conducting an "ICO for ICOs," offering its ICOS tokens to the general public from August 9, 2017 to September 15, 2017.

28.    ICOBox summarized the ICOS offering in its "White Paper" dated August 2017 and posted on the company's website and social media channels.

29.    Before and during the offering, Defendants promoted the offering online, through social media and interviews, as well as by Evdokimov's appearances at several crypto-enthusiast conferences.

30.    Social media channels used by Defendants included Facebook, Twitter, and Telegram.

31.    ICOBox structured the sale of ICOS tokens in five consecutive phases— an Early Bird Presale, Presale, Early Bird ICO, ICO 1st, and ICO 2nd. The cost per ICOS token increased over each of the five phases, starting at 0.008 bitcoin on August 9, 2017 and increasing to 0.012 bitcoin during the final weeks of the token sale ending September 15, 2017 (*i.e.*, from $27 to $60 per ICOS token).

32.    During the two "presale" phases, investors were required to purchase between 1,000 and 10,000 tokens, with the minimum purchase dropping to one ICOS token during the final phases of the offering.

33.    In ICOBox's online materials and social media accounts, Defendants advertised the ICOS tokens as being available for purchase by the "public globally" including in the United States. For example, ICOBox's August 2017 White Paper stated, "The offering will be open to the public globally." On August 14, 2017, in the midst of the ICOS sale, an ICOBox team member confirmed on the company's Telegram channel that the sale was open to United States investors "since this is a product token."

34.   ICOBox did not impose sophistication or accreditation standards on investors, and did not collect biographical information concerning its investors.

35.   ICOBox accepted payment from investors for the ICOS tokens in the form of bitcoin, ether, litecoin, dash, zcash, ethereum classic, and US dollars.

36.   For every 100 ICOS tokens sold to investors, the company announced in its White Paper that it planned to issue 20 additional tokens for "distribution to partners, advisors, bounty participants, and the team members."

37.   Throughout the offering, the company provided a 5% "referral" bonus for investors who promoted the offering.

38.   According to ICOBox's White Paper, there was no minimum or cap on the number of tokens that could be sold, or the amount that could be raised through the offering.

**2.    The ICOBox Project**

39.   ICOBox's White Paper stated that "[t]he essence of the project is to raise funds by selling ICOS tokens," and that the primary use of these proceeds would be to fund the provision of ICOBox's facilitation services to other potential ICO issuers who could not afford ICOBox's fees.

40.   According to ICOBox's website and marketing materials disseminated to potential clients, ICOBox charged potential ICO issuers flat fees starting at $250,000 depending on the facilitation service package provided; if the issuer's ICO successfully raised funds, ICOBox charged success fees starting at 1.5% of the amount raised.

41.   The White Paper explained that potential ICO issuers which had fees paid for with the funds raised by the ICOS token sale agreed to make their future tokens available to ICOS token holders, who could swap their ICOS tokens for an issuer's tokens at a discount.

42.   The White Paper further explained that if a prospective issuer could not afford ICOBox's fees, the potential ICO would be "screened by ICOBox experts" to

determine if it met certain criteria sufficient to place the ICO on the ICOS platform; the criteria included "economic viability," "unique offer" and "team (visionary, team members' competence and potential)."  After ICOBox experts decided which potential ICOs to place on the ICOS platform, ICOS token holders could vote to select the potential ICOs that they believed should receive facilitation services paid for by the funds raised through the ICOS token sale.

43.     According to the projected timeline in ICOBox's White Paper, the ICOS platform would be launched on September 1, 2017, and the first voting and selection of new ICO projects would take place on October 2, 2017.

44.     According to ICOBox's Twitter account, ICOBox launched the ICOS platform on or about September 27, 2017, and the first voting and selection of new ICO projects took place on or about October 15, 2017.

### 3.     ICOS Token Holders Reasonably Believed They Could Profit from Their Investments

45.     ICOBox's White Paper and online promotional statements stated that ICOS token holders could profit in two different ways—from discounts on the ICOS platform and by trading ICOS tokens on digital asset platforms.

46.     In its White Paper, ICOBox highlighted the ability of ICOS token holders to profit by swapping their ICOS tokens at a roughly one-to-four rate for tokens that would be issued during future ICOs by ICOBox's clients.

47.     The White Paper claimed that this equated to, on average, a "75% discount," and provided several hypothetical calculations to summarize the enhanced "purchasing power" that would be afforded to ICOS token holders.

48.     On social media and interviews posted online, ICOBox and Evdokimov frequently referred to this aspect of the ICOS tokens, and claimed that token holders were "essentially getting an ICO discount pass."  For example, on August 1, 2017, an ICOBox team member posted on the company's Telegram channel that "basically it is an opportunity to get 4 tokens of a certain project for only 1 ICOS token, which

means you are essentially getting an ICO discount pass."  On August 7, 2017, Evdokimov stated in an interview posted online on the crypto-enthusiast website Urbancrypto.com that ICOBox's anticipated clients would "give the token holders a fixed number of their future tokens, which will be exchangeable for ICOS tokens with an average of 75% discount if ICOS token holders so choose."  And on August 12, 2017, Evdokimov posted on Medium.com that "we get a ratio of 1:4, and, consequently, a 75% discount.  So if you buy $1,000 worth of ICOS tokens, you could exchange them for tokens of other projects worth $4,000."

49.    Evdokimov claimed online that this facet of the offering provided a "minimization of risks" to the investment.  For example, in a July 27, 2017 press release posted on ICOBox's website, Evdokimov stated, "We are offering cost control and minimization of risks of this type of token offerings [*sic*]."  And on August 12, 2017, in a Medium.com post, Evdokimov indicated that the ICOS token's "function is similar to a discount card: It's a tool which allows you to minimize both the cost of buying the tokens and the risks associated with it."

50.    On August 7, 2017, Evdokimov stated in an interview posted on Urbancrypto.com that "it's a win-win: startups can do their ICOs at a reasonable price, or even free, while ICOS token holders get to acquire new ICO tokens at a very attractive price and support new market actors."

51.    In addition, both prior to and during its offering, ICOBox and Evdokimov made numerous statements online and on social media boasting about the large volume of anticipated ICOBox clients.

52.    For example, according to the White Paper, ICOBox planned to conduct "about 800 ICOs" in ICOBox's first year.

53.    Likewise, in an interview posted on Urbancrypto.com on August 7, 2017, (prior to the ICOS offering), Evdokimov stated, "Our goal is to do 800 ICOs in the next year. . . . based on our math, the 800 annual ICOs is quite realistic."

54.     Similarly, on social media, ICOBox's management claimed it anticipated facilitating over 100 offerings per month once the platform was operational, and planned to cover almost the entirety of the ICO market—with a goal of allowing "ICOS holders to participate in 80-90% of all token offerings," for example in statements made on Telegram on July 29 and July 31, 2017.

55.     During the offering, ICOBox also repeatedly emphasized that ICOS token holders would be able to profit by trading the ICOS tokens on digital asset platforms shortly after issuance.

56.     For example, on August 13, 2017, in the midst of the ICOS token offering, the company responded to a question on Telegram about whether the tokens would be tradeable, stating that "Company HitBTC [a digital asset trading platform] bought ICOS tokens at the stage of the Pre Sale [sic] and placed them on its stock exchange. . . .  As you can see, the token exchange rate on HitBTC is twice as high as on icos.icobox.io.  It is a very good sign for buying them!"

57.     On Telegram on August 17, 2017, ICOBox even pointed to the planned placement on these secondary trading platforms as reducing concern that the company's clients might not issue sufficiently valuable tokens to make it worth swapping the ICOS tokens—i.e., to make the "discount card" valuable—stating "You don't have to exchange your ICOS in the first two months after issue.  You can wait until tokens will hit [sic] the exchanges."

58.     The ICOS tokens were ultimately listed on several digital asset trading platforms including HitBTC, Etherdelta, and Tidex.

### 4.     The ICOS Platform's Success Depended on ICOBox's Management

59.     According to ICOBox, the success of its platform depended on ICOBox's management team, and in particular on Evdokimov.

60.     In a July 27, 2017 press release posted online, the company stated that "ICOBox was founded by . . . blockchain visionaries" including Evdokimov.  And Evdokimov described himself in an interview posted on Crypto-economy.net on

September 4, 2017, in the midst of the ICOS sale, as having "founded numerous successful companies that conduct ICOs," and "written several books and articles on digital marketing and blockchain."

61.     On August 7, 2017, Evdokimov told the website Urbancrypto.com (prior to the offering), that: "[o]ur team comprises great people with excellent knowledge in their respective fields.  They are the cream of cream in ICO technology, marketing and legal support—the latter being extremely important in this industry.  Many of them have been part of several ICOs, so they have not just a strictly theoretical, but very practical, hands-on knowledge of how to do it right.  The team has extensive experience working together on cutting-edge in IT and automation projects and, specifically, on ICOs."

62.     ICOBox claimed that its team had sufficient personnel to support the large volume of anticipated offerings, stating on Telegram on June 29, 2017 (days after the company was formed and prior to the ICOS sale) that "our team currently has enough members to be able to handle 50 ICO's in a single month[. . .] we are planning to expand."

63.     Although the White Paper stated that ICOS token holders would have the ability to "vote" and "comment" on proposed projects on ICOBox's platform, ICOBox in fact restricted the token holders' voting rights.

64.     Token holders could not vote on ICOs by potential clients who had the money to pay for ICOBox's facilitation services; instead, they could vote only on the subset of nonpaying potential clients' projects that already had been "screened by ICOBox experts" in what the White Paper referred to as an "initial audit."

65.     Token holders would not have been readily able to aggregate their votes, since the identities of ICOS token holders were not available to each other (or to ICOBox), and management allocated itself and partners 20 tokens for every 100 issued to investors.

66.     Token holders' ability to comment, as described in the White Paper, was an informal mechanism for providing feedback to potential ICOBox clients. It was not proportional to the number of tokens held, and no minimum amount of tokens was required to provide comments.

**5.     ICOBox and Evdokimov Offered and Sold Securities**

67.     Through its offering, ICOBox raised roughly $14.6 million from approximately 2,122 investors, including U.S. investors, between August 9, 2017 and September 15, 2017.

68.     ICOBox was the issuer of the tokens, and directly offered and sold the ICOS tokens to investors through its website.

69.     Evdokimov directly offered and sold the ICOS tokens. He held himself out as the company's founder and public face, and promoted the offering through ICOBox's website and on social media postings and interviews.

70.     Through his actions, Evdokimov also was a necessary participant and a substantial factor in the offer and sale of the ICOS tokens.

71.     The majority of the investors bought during the initial days of the ICO, with all but $600,000 of the $14.6 million raised by the end of August 2017.

72.     The company increased its social media pressure during the final days of the offering, sending messages on social media every few minutes. For example, ICOBox posted on Twitter on September 15, 2017 that: "Time's running out in 1.5 hours the #ICOS #tokensale will end. 3898 BTC [bitcoin] collected so far. Excitement is mounting."

73.     The average price paid per ICOS during the offering was $40/token.

74.     After the offering closed, on September 22, 2017, ICOBox issued 591,617 ICOS tokens on the Ethereum blockchain, which included the tokens issued to investors, referral bonus recipients, and the ICOBox team.

### 6.     ICOBox Failed to Register the ICOS Token Offering

75.     ICOBox took no steps to register the ICOS offering or qualify for any exemption, even though ICOBox and Evdokimov were well aware of the SEC's then-recently issued July 2017 *DAO Report* and the potential implications of the federal securities laws on sales of digital assets.

76.     In the days leading to the ICOS sale's August 9, 2017 launch, Evdokimov gave interviews (including to Reuters) and made statements online about his interpretation of the *DAO Report*, incorrectly claiming that the ICOS offering was not a security or had an "exemption" from registration because the token had a "utility."  According to an article posted on Reuters.com and other sites on July 27, 2017, "ICOBox founder told Reuters their ICOs have utility."  In the following days, ICOBox and Evdokimov commented on the article on the company's Twitter account, including posting on July 30, 2017 that "Nick Evdokimov said our tokens have a utility, the most likely exemption."  Evdokimov did not say what that purported utility was or how that would constitute an exemption from the securities laws.

77.     Similarly, on Telegram, the company's management team received multiple questions from potential investors as to whether the company was able to offer the tokens broadly to all US investors given the apparent application of the federal securities laws.

78.     Management responded that it could (and did) sell to US investors and the company did not require information from purchasers to assess whether they were accredited investors.  For example, on Telegram on August 25, 2017 (in the midst of the ICOS sale), a potential investor asked "Can ICOS tokens be bought in the US?  I saw there could be regulations in the US for ICOs, is your team knowledgeable on that?  I didn't see any identity verification to get some of your tokens, whereas other groups . . . had a very strong vetting process to avoid issues with the SEC."  An ICOBox team member responded:

"Yes, you can purchase them while in U.S.  SEC's press release is not a new law.  It stemmed from the investigation of a specific company, The DAO, which issued its tokens.  In fact, The DAO's tokens were securities, but the company was selling then in violation of the laws regulating securities market.  However, not all tokens are securities by default.  In addition to laws which define what is and is not a security, there exists a large volume of court decisions on the issue.  Court decisions also define the criteria which help determine if a particular transaction is a security.  Depending on the situation the term 'token' may mean both securities and other financial tools, and this fact was adequately reflected in SEC's press release. Our tokens are not securities. They are a product which has its purpose and functions.  Because ICOS token is not a security, its sale does not require registration."

79.     Likewise, on Telegram on September 5, 2017 (during the ICOS sale), an ICOBox co-founder stated "utility ICOs are totally fine now in US, EU, Singapore, Japan, South Korea (yes, they are) and many other countries."

80.     As a result of ICOBox's failure to register the offering, prospective ICOS purchasers had no ability to assess key information that would have been included in a registration statement, including regarding the company's prospects for supporting the number of offerings forecasted in the promotional materials, which was central to the anticipated success of the platform and the token holders' investments.

81.     Instead, ICOBox minimized prospective investors' concerns online.  For instance, in response to a potential investor's question on August 10, 2017 on Telegram whether the project would fail if the company did not bring in a certain number of clients, an ICOBox team member responded, "well, first of all, we'll probably get like x10 [*sic*] that amount and second, there are about 30 requests a day for the ICOBox [*sic*] with upfront fee"—claims that seem unsupported given the ultimate number of clients the company obtained.

82.    Likewise, ICOBox's team members highlighted on social media during the offering that ICOBOX had started to work with certain clients including Paragon (referring to it as ICOBox's "child"), but did not disclose that no ICOBox clients had yet completed any ICOs using its services.

83.    In the two years after the ICOS offering, ICOBox has facilitated approximately 35 ICOs, far fewer than the 800 per year forecasted in ICOBox's White Paper and promotional materials.

84.    ICOBox recently announced it was discontinuing the platform for swapping ICOS tokens for deferred-payment clients, rendering the supposed discount "purchasing power" of the ICOS tokens obsolete.

85.    ICOS tokens have experienced a precipitous loss in value since the issuance on September 22, 2017.  As of June 24, 2019, the tokens were worth at most approximately $2.41 per ICOS token—if they are able to be traded at all— roughly $1/20^{th}$ of the average purchase price during the offering (and roughly $1/30^{th}$ the price paid by investors who purchased during the final days of the ICO).

**C.    Defendants Acted as Unregistered Brokers for ICOBox's Clients' ICOs**

**1.    Defendants Provided "Marketing" Services for "Success" Fees**

86.    Since the ICOS offering in August 2017, ICOBox has facilitated approximately 35 clients launching ICOs, which have raised an estimated $650 million dollars from investors.

87.    On its website, ICOBox promoted itself to potential clients as a "Blockchain Growth Promoter and Business Facilitator for companies seeking to sell their products via ICO crowdsales."

88.    The company provided various services to its clients to foster their ICOs, such as "technology" (including drafting smart contracts and developing online payment processing applications), "legal" (including company formation and opinion letters through outside consultants), and, of particular import here, "marketing."

COMPLAINT                                          17

ICOBox offered these services individually or in packages, such as ICOBox's "Basic Package," which included a combination of the three categories.

89.     ICOBox's "marketing" services, which it provided to at least 27 of its clients, included advising investors on the merits of the clients' offerings and actively soliciting investors to purchase the clients' tokens.

90.     Specifically, the "marketing" services, as advertised in ICOBox's brochures and on the company's website throughout the relevant timeframe, included:

- "[E]nsur[ing] soundness of the business model" and reviewing the "token concept";

- Providing "listing services," entailing disseminating information about the clients' ICOs through various websites that review digital tokens including "icobench.com" and "icorating.com";

- Using "established contacts with blockchain media" to perform "pitching to blockchain media journalists";

- Using "established contacts with video bloggers . . .  to quickly broadcast your information";

- Developing the content for these online promotional materials, including "[f]eature story development and pitching" and "[w]riting, editing and distribution of press releases and media alerts";

- Increasing internet traffic concerning the clients' tokens on internet search engines;

- Promoting the clients' tokens at in-person conferences and on ICOBox's website and social media channels, including by disseminating the clients' white papers and other promotional materials prepared by the clients;

- Posting links to information about ICOBox's clients' offerings on ICOBox's website; and

- Providing a platform for investors to acquire ICOBox's clients' tokens using ICOS tokens.

91.    ICOBox charged its clients two types of fees for these "marketing" services: flat fees and success fees.

92.    The flat fee depended on the category and extent of the services, including, for example, ICOBox's "Basic Package" costing roughly $250,000.

93.    In addition, ICOBox charged self-described "success" fees, related to the amount raised during the clients' offerings.

94.    The "success" fees, which were transaction-based compensation, ranged from 1.5% to 6% of the amount raised during the clients' ICOs.

95.    At least one of the tokens issued by ICOBox's clients constituted securities.

96.    For example, the "PRGs" offered and sold by ICOBox's client Paragon between August 2017 and October 2017 constituted securities under *Howey*.

97.    Paragon raised approximately $12,066,000 worth of cryptocurrencies from approximately 8,323 investors including in the United States through its sales of PRGs to the general public.

98.    In Paragon's White Paper and other online promotional materials, Paragon represented that it would use the proceeds to build a cannabis-related "ecosystem," the development of which would cause the PRGs to rise in value.

99.    Paragon made representations in their White Paper and online that led potential purchasers to reasonably expect to profit from the efforts of Paragon's management.

100.   For example, Paragon's White Paper stated that the coins are "designed to appreciate in value as our solutions are adopted throughout the cannabis industry and around the world.  Our model incentivizes PRG owners to hold their tokens as long term growth assets, in addition to spending PRG on any of our platforms."

101.   Paragon also promoted its efforts to control and increase the price of the PRGs, and their plans for PRGs to be placed on digital asset trading platforms.

102.   Paragon claimed in its White Paper and other online materials that its management's expertise would be responsible for the success of the venture and the profitability of the PRGs.

103.   On July 22, 2017, Paragon retained ICOBox to perform "marketing" services in connection with the PRG offering, through a "Services Agreement" signed by an ICOBox co-founder.

104.   As part of the agreement, ICOBox agreed to give input on Paragon's white paper for its planned ICO, advising on the promotion of the ICO including in retaining team members, increasing online visibility of the offering, disseminating promotional and offering materials regarding Paragon's tokens, attracting investors through ICOBox's online and social media platforms, and communicating with potential investors about the merits of the offering.

105.   Paragon agreed to pay ICOBox a 3% success fee based on the amount Paragon raised during its token sale, which was ultimately approximately $12,066,000.

## 2.   Evdokimov Has Played an Active Role in Providing These Services

106.   In his various roles as ICOBox's co-founder, "vision director," and CEO, Evdokimov has managed ICOBox's operations, including overseeing and engaging in the "marketing" services described above.

107.   Evdokimov personally registered ICOBox's website, which was the primary repository for attracting clients and the portal for interested investors to obtain information about investing in the clients' ICOs.

108.   Since the company's inception, Evdokimov has been active in soliciting clients for ICOBox's services online, on social media, in interviews with crypto-enthusiast websites, and during appearances at blockchain conferences.

109.   Evdokimov personally disseminated information about ICOBox's clients' offerings to prospective investors through ICOBox's Twitter account as well as his own Twitter account @neopotus.  For example, on July 16, 2018, Evdokimov posted on his Twitter account that "On Tuesday, July 17 our token holders can swap ICOS tokens for tokens of [ICOBox client]. The #blockchain based platform connects companies, buyers, & sellers in any kind of industry and helps them to achieve higher efficiency.  Learn more…" and provided a link to the client's promotional materials.

110.   With respect to Paragon in particular, Evdokimov discussed the merits of the offering with prospective investors on an ICOBox social media channel.

111.   For example, on ICOBox's Telegram channel on September 18, 2017, Evdokimov responded to claims by some posters that Paragon was a "scam," by arguing that:  "No, Paragon is [*sic*] really good project with brilliant idea and perfect team."

### 3.    Defendants' Conduct Is Ongoing

112.   ICOBox continues to advertise its services for facilitating token sales on its publicly available website (although, as noted above, as of March 2019, the company no longer allows clients to defer payment through the ICOS swap platform).

113.   The company claims to have shifted to "security token offerings" or "STOs," stating in a January 2019 press release that "ICOBox Founder Nick Evdokimov Aims to Make His Company the Leader of the Emerging Security Token Market."  The services offered to the clients in connection with these asset-backed offerings—and the success fees charged for those services—are the same as those advertised for token sales.

114.   Evdokimov continues to actively manage the company and its services. Evdokimov purportedly left the company for some part of 2018, but he continued to be listed as part of the company's management team on ICOBox's website in 2018 and also continued to promote ICOBox's services on his personal social media account until at least July 2018.

115.   Evdokimov also has been acting in the capacity of ICOBox's CEO since December 2018.  As described in a January 2019 company press release, Evdokimov is "in charge of updating the company's crypto market presence strategy, creating new products, and operational management, including the overhaul of the project's team to ensure that its combined expertise closely reflects the new market realities."

116.   Neither ICOBox nor Evdokimov have ever been registered with the SEC in any capacity, or associated with any registered broker-dealers.

## FIRST CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants ICOBox and Evdokimov)

117.   The SEC realleges and incorporates by reference paragraphs 1 through 116 above.

118.   As alleged above, Defendants ICOBox and Evdokimov offered and sold securities, in the form of ICOBox's ICOS tokens, to investors in interstate commerce, without filing a registration statement with the SEC, and without qualifying for any exemption from registration.

119.   By engaging in the conduct described above, Defendants ICOBox and Evdokimov, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

120.   By engaging in the conduct described above, Defendants ICOBox and Evdokimov have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

COMPLAINT                                    22

# SECOND CLAIM FOR RELIEF

## Unregistered Broker-Dealer

## Violation of Section 15(a) of the Exchange Act

## (against Defendants ICOBox and Evdokimov)

121.   The SEC realleges and incorporates by reference paragraphs 1 through 116 above.

122.   As alleged above, Defendants ICOBox and Evdokimov, without registering as brokers, actively solicited investors for ICOBox's clients, and received transaction-based compensation for their services, in the form of "success" fees based on the amounts raised from investors during ICOBox's clients' ICOs.

123.   By engaging in the conduct described above, Defendants ICOBox and Evdokimov, and each of them, made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

124.   By engaging in the conduct described above, Defendants ICOBox and Evdokimov have violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

# **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants ICOBox and Evdokimov, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants ICOBox and Evdokimov, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

## **IV.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## **V.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 18, 2019

/s/ *Amy J. Longo*
Amy J. Longo
Attorney for Plaintiff
Securities and Exchange Commission