1  AMY J. LONGO (Cal. Bar No. 198304)
   Email:  longo@sec.gov
2  BRENT W. WILNER (Cal. Bar No. 230093)
   Email:  wilnerb@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka N. Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8

9           UNITED STATES DISTRICT COURT

10          CENTRAL DISTRICT OF CALIFORNIA

11                  Western Division

12  SECURITIES AND EXCHANGE          Case No. 2:19-cv-08066-DSF (Ex)
    COMMISSION,
13                                    **PLAINTIFF SECURITIES AND
              Plaintiff,              EXCHANGE COMMISSION'S
14                                    MEMORANDUM IN SUPPORT OF
        vs.                           MOTION FOR DEFAULT
15                                    JUDGMENT AGAINST
    ICOBOX and NIKOLAY               DEFENDANTS ICOBOX AND
16  EVDOKIMOV,                        NIKOLAY EVDOKIMOV**

17            Defendants.             Date:      February 10, 2020
                                      Time:      1:30 p.m.
18                                    Ctrm:      7D
                                      Judge:     Hon. Dale S. Fischer
19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................1

II.     STATEMENT OF FACTS ....................................................................2

    A.      Defendants' Sale of Unregistered Securities................................3

    B.      Defendants' Unregistered Broker Services for Clients' ICOs............7

    C.      Defendants' Current Status ....................................................9

III.    ARGUMENT ...................................................................................10

    A.      The SEC Has Complied With Fed. R. Civ. P. 55(a) and L.R. 55-1...11

    B.      The *Eitel* Factors Support Entry of Default Judgment......................12

        1.      Possibility of prejudice to the SEC .........................................12

        2.      Substantive merits and sufficiency of the complaint..............13

        3.      Amount at stake and seriousness of defendants' conduct .......17

        4.      Possibility of disputed facts .................................................17

        5.      Possibility of excusable neglect ...........................................18

        6.      Policy for deciding on the merits..........................................18

    C.      The SEC Is Entitled to the Relief it Seeks ........................................19

        1.      ICOBox and Evdokimov should be permanently enjoined.....19

        2.      The Court should order joint and several disgorgement with prejudgment interest................................................................20

        3.      The Court should order second tier penalties against Evdokimov ........................................................................23

    D.      Default Judgment Should be Entered Without Delay........................24

IV.     CONCLUSION.................................................................................25

i

# **TABLE OF AUTHORITIES**

## **CASES**

*Aldabe v. Aldabe,*
    616 F.2d 1089 (9th Cir. 1980) ..................................................................10

Anderson v. Aurotek,
    774 F.2d 927 (9th Cir. 1985) ....................................................................13

*Benny v. Pipes,*
    799 F.2d 489 (9th Cir. 1986) .............................................................10, 13

*Eitel v. McCool,*
    782 F.2d 1470 (9th Cir. 1986) ........................................10, 17, 18, 19

*First T.D. & Investment, Inc.,*
    253 F.3d 520 (9th Cir. 2001) ....................................................................24

*Frow v. De La Vega,*
    82 U.S. 552 (1872) ......................................................................................24

*Hakkasan LV, LLC v. Adamczyk,*
    No. 2:14-CV-01717, 2017 WL 1549508 (D. Nev. Apr. 5, 2017) ..................12

*Kloepping v. Fireman's Fund,*
    1996 U.S. Dist. LEXIS 1786 (N.D. Cal. Feb. 14, 1996) ................................10

*Landstar Ranger, Inc. v. Parth Enterprises, Inc.,*
    725 F. Supp. 2d 916 (C.D. Cal. 2010) ......................................................13

*McCarthy v. Langston,*
    23 F.R.D. 249 (N.D. Fl. 1959) ................................................................12

*Mullane v. Central Hanover Trust Co.,*
    339 U.S. 306 (1950) ....................................................................................18

*PepsiCo Inc. v. Triunfo-Mex. Inc.,*
    189 F.R.D. 431 (C.D. Cal. 1999) ............................................................10

*PepsiCo, Inc. v. Cal. Sec. Cans,*
    238 F. Supp. 2d 1172 (C.D. Cal. 2002) ......................10, 12, 13, 17, 19

*Phillip Morris USA, Inc. v. Castworld Prods., Inc.,*
    219 F.R.D. 494 (C.D. Cal. 2003) ............................................................18

*SEC v. Abacus Int'l Holding Corp.,*
    2001 U.S. Dist. LEXIS 12635 (N.D. Cal. Aug. 16, 2001) ..........................23

*SEC v. Baccam,*
    No. ED CV 17-0172 SJO (SPx), 2017 WL 5952168
    (C.D. Cal. June 14, 2017) ..................................................................18, 20

*SEC v. Benger,*
   697 F. Supp. 2d 932 (N.D. Ill. 2010) ................................................16

*SEC v. Blockvest, LLC,*
   No. 18-CV-2287-GPB(BLM), 2019 WL 625163
   (S.D. Cal. Feb. 14, 2019) ..............................................................14

*SEC v. CMKM Diamonds,*
   729 F.3d 1248 (9th Cir. 2013 ........................................................15

SEC v. Continental Tobacco Co.,
   463 F.2d 137 (5th Cir. 1972) ..........................................................14

*SEC v. Cross Financial Services, Inc.,*
   908 F. Supp. 718 (C.D. Cal. 1995) ............................................21, 22

*SEC v. Eurobond Exch., Ltd.,*
   13 F.3d 1334 (9th Cir. 1994) ..........................................................15

*SEC v. First City Financial Corp., Ltd.,*
   890 F.2d 1215 (D.C. Cir. 1989) ......................................................21

*SEC v. Hansen,*
   1984 WL 2413 (S.D.N.Y. Apr. 6, 1984) ...........................................17

*SEC v. Hui Feng,*
   935 F.3d 721 (9th Cir. 2019) .....................................................16, 17

*SEC v. Hui Feng,*
   No. 15-CV-09420, 2017 WL 6551107 (C.D. Cal. Aug. 10, 2017) ...........16

*SEC v. JT Wallenbrock & Associates,*
   440 F.3d 1109 (9th Cir. 2006) .................................................20, 21, 22

*SEC v. Kenton Capital, Ltd.,*
   69 F. Supp. 2d 1 (D.C. Cir. 1998) ...................................................23

*SEC v. Koracorp Industries, Inc.,*
   575 F.2d 692 (9th Cir. 1978) ..........................................................19

*SEC v. Manor Nursing Centers, Inc.,*
   458 F.2d 1082 (2d Cir. 1972) .........................................................21

*SEC v. Moran,*
   944 F. Supp. 286 (S.D.N.Y. 1996) ..................................................23

SEC v. Murphy,
   626 F.2d 633 (9th Cir. 1980) ...............................................13, 15, 16, 19, 23

*SEC v. Newman,*
   CV 12-03142-BRO (PLAx), 2016 U.S. Dist. LEXIS 193639
   (C.D. Cal. July 15, 2016) ..............................................................13

SEC v. Phan,
   500 F.3d 895 (9th Cir. 2007) .....................................................13, 15

*SEC v. Platforms Wireless International Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ...........................................16, 20, 21, 22

*SEC v. Qi*,
    No. CV 17-08856-CJC(JCX), 2018 WL 5263187
    (C.D. Cal. Mar. 21, 2018) ...........................................................16

*SEC v. R.G. Reynolds Enters., Inc.*,
    952 F.2d 1125 (9th Cir. 1991) ....................................................14

*SEC v. Rind*,
    991 F.2d 1486 (9th Cir. 1993) ....................................................20

*SEC v. Rogers*,
    790 F.2d 1450 (9th Cir. 1986) ....................................................15

*SEC v. Rubera*,
    350 F.3d 1084 (9th Cir. 2003) ....................................................14

*SEC v. Schooler*,
    106 F. Supp. 3d 1157 (S.D. Cal. 2015) .....................................22

*SEC v. Souza*,
    2011 WL 2181365 (E.D. Cal. June 3, 2011) ...........................24

*SEC v. W. J. Howey Co.*,
    328 U.S. 293 (1946)...................................................................14

*SEC v. Wallace*,
    Case No. SACV 16-01788 AG (FFMx), 2017 WL 8230026
    (C. D. Cal. May 8, 2017) ...........................................................13

*T-Cetra, LLC v. Guzman*,
    No. CV 16-6416 DSF (AFMx), 2017 WL 7156250
    (C.D. Cal. Dec. 15, 2017) ..........................................................10

*TeleVideo Sys., Inc. v. Heidenthal*,
    826 F. 2d 915 (9th Cir. 1987) ..............................................10, 17

*U.S. v. Odessa Union Warehouse Coop.*,
    833 F.2d 172 (9th Cir. 1987) ......................................................19

*U.S. v. Zaslavskiy*,
    No. 17 CR 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018)............14

*Vitaly Anaykin, et al., v. Nikolay Evdokimov, et al.*,
    No. 19-CV-8165, 2019 WL 4741550 (C.D. Cal. Sept. 20, 2019).....................2

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) ....................................................14

*Wood v. Hampton-Porter Investment Bankers*,
    No. C-02-5367 MMC, 20014 WL 546888 (N.D. Cal. 2004)............12

iv

# FEDERAL STATUTES

## Securities Act of 1933

Section 2(a)(1)
[15 U.S.C. § 77b(a)(1)]...................................................................14

Section 5
[15 U.S.C. § 77e]...........................................................................13

Section 5(a)
[15 U.S.C. § 77e(a)]..........................................................2, 13, 19, 20

Section 5(c)
[15 U.S.C. § 77e(c)]..........................................................2, 13, 19, 20

Section 20(b)
[15 U.S.C. § 77t(b)]..........................................................................19

Section 20(d)(2)(A)
[15 U.S.C. § 77t(d)(2)(A)]...............................................................23

Section 20(d)(2)(B)
[15 U.S.C. § 77t(d)(2)(B)]...............................................................24

Section 21(d)(2)
[15 U.S.C. § 77t(d)(2)]......................................................................24

## Securities Exchange Act of 1934

Section 3(a)(4)
[15 U.S.C. § 78c(a)(4)].....................................................................16

Section 15(a)
[15 U.S.C. § 78o(a)] ...........................................2, 13, 16, 19, 20

Section 21(d)
[15 U.S.C. § 78u(d)(1)].....................................................................19

Section 21(d)(3)(B)
[15 U.S.C. § 78u(D)(3)(B)]..........................................................23, 24

Section 21(d)(3)(B)(ii)
[15 U.S.C. § 78u(d)(3)(B)(ii)].........................................................24

# FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 4(e)(2)(B) ................................................................11

Fed. R. Civ. P. 4(h)(1)(A) .................................................................1

Fed. R. Civ. P. 4(h)(1)(B) ................................................................11

Fed. R. Civ. P. 54(b) ........................................................................24

Fed. R. Civ. P. 54(c)........................................................................12

v

Fed. R. Civ. P. 55(a) ................................................................10, 11

Fed. R. Civ. P. 55(b) ...............................................................10, 18

Fed. R. Civ. P. 55(b)(2) ...............................................................2, 12

**LOCAL RULES**

Local Rule 55-1 ...........................................................................11, 12

**OTHER AUTHORITIES**

10A Charles Wright, Arthur Miller & Mary Kane, Federal Practice &
    Procedure § 2688 (3d ed. 2010)...............................................21

William W. Schwarzer *et al.,* California Practice Guide: Federal Civil
    Procedure Before Trial § 6:91 (2010) ................................11

**CALIFORNIA CODE OF CIVIL PROCEDURE**

Cal. Civ. Proc. 415.20(a) ..............................................................1

## I.   **INTRODUCTION**

Plaintiff Securities and Exchange Commission ("SEC") hereby moves for entry of default judgment against defendants ICOBox and Nikolay Evdokimov ("Evdokimov") ("defendants"), whose defaults for failure to respond to the complaint were entered by the clerk on October 28, 2019.  *See* Dkt. No. 11 [Clerk Default]. The SEC filed this action on September 18, 2019.  *See* Dkt. No. 1 [Complaint].  The complaint alleges that defendants conducted an unregistered securities offering and acted as unregistered securities brokers for "initial coin offerings" ("ICOs").

ICOBox, an incubator for digital asset startups, was founded in mid-2017 by Evdokimov, its CEO and "vision director."  To raise funds, defendants sold approximately $14.6 million worth of securities in the form of digital assets called "ICOS" tokens.  Between August 9, 2017 and September 15, 2017, defendants sold ICOS tokens to over 2,000 investors, in the United States and globally, through ICOBox's website, https://icobox.io.  By not registering the offering with the SEC, defendants violated the securities laws' registration requirements.

Defendants also acted as unregistered securities brokers.  Since August 2017, defendants facilitated token sales by over 30 clients, collectively raising over $650 million, and charging "success fees" of 1.5% of the amounts raised.  The token sale by at least one such client, Paragon Coin, Inc. ("Paragon"), constituted a securities offering.  By soliciting and attracting investors to securities offerings in exchange for transaction-based compensation, without registering as or associating with a broker-dealer, defendants likewise violated broker registration requirements.

On September 21, 2019, the SEC served ICOBox, pursuant to Fed. R. Civ. P. 4(h)(1)(A) and Cal. Civ. Proc. 415.20(a), and served Evdokimov, pursuant to Fed. R. Civ. P. 4(e)(2)(B).  *See* Dkt. No. 9 [Proof of Service].  The SEC personally delivered these documents to the address in Beverly Hills, California that, at the time, served as Evdokimov's residence and one of ICOBox's offices.  The documents were received by Maria Batura, Evdokimov's co-resident and wife, who worked with Evdokimov

1

1  out of that address.  *Id.*  Shortly after being served with the SEC's complaint,

2  Evdokimov, Batura, and ICOBox vacated the Beverly Hills premises.  *See*

3  Declaration of Amy Jane Longo *filed concurrently herewith* ("Longo Decl.") ¶¶ 4-5,

4  8, Ex. 5.  Neither ICOBox nor Evdokimov responded to the complaint, and on

5  October 21, 2019, the SEC requested that the clerk enter defaults under Fed. R. Civ.

6  P. 55(a).  *See* Dkt. No. 10.  The clerk entered defaults on October 28, 2019.  *See* Dkt.

7  No 11.[1]

8      The SEC now moves under Rule 55(b)(2) for entry of default judgment against

9  defendants, permanently enjoining them from future violations of Sections 5(a) and

10 (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77e(a), (c)] and

11 Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §

12 78o(a)]; ordering them jointly and severally to disgorge ill-gotten gains in the amount

13 of $14.6 million with prejudgment interest of $1,459,428.99; and imposing a civil

14 penalty against Evdokimov of $189,426.[2]

15 **II.   STATEMENT OF FACTS**

16     The SEC's complaint alleges that ICOBox, a privately-owned limited liability

17 company, was formed in the Cayman Islands on June 23, 2017.  Dkt. No. 1 ("Cmpl.")

18 ¶ 18.  ICOBox claimed to have between 50 and 150 employees in offices globally,

19 including in San Francisco.  *Id.*  Neither ICOBox nor any of its securities have ever

20 been registered with the SEC nor with any registered broker-dealers.  *Id.*

21     Evdokimov, then a resident of Beverly Hills, co-founded ICOBox, registered

22 its domain name (https://icobox.io), and served as its CEO since December 27, 2018.

23 *Id.* ¶ 19.  Like ICOBox, he has never been registered with the SEC nor with any

24

25

26 [1] On December 10, 2019, the Court issued an order requiring the SEC to file this
   default judgment motion on or before January 10, 2020.  *See* Dkt. No. 12.

27 [2] After the SEC's action was filed, Evdokimov was named as a defendant in a private
   investor's securities fraud action filed on September 20, 2019, *Vitaly Anaykin, et al.,*
28 *v. Nikolay Evdokimov, et al.*, No. 19-CV-8165, 2019 WL 4741550 (C.D. Cal. Sept.
   20, 2019), also pending before this Court.

broker dealer. *Id.* Since ICOBox's founding, he has been the face of the company, representing it online, on social media, and in interviews to blockchain-centric media sites. *Id.* After co-founding ICOBox, Evdokimov purportedly left the company for some part of 2018, though he remained listed among ICOBox's management on its website, and continued to promote ICOBox on his personal social media account. *Id.* ¶ 114. In December 2018, Evdokimov became ICOBox's CEO. *Id.* ¶ 115.

### A. Defendants' Sale of Unregistered Securities

An ICO is a fundraising event in which an entity offers participants a unique "coin," "token," or "digital asset," in exchange for consideration, often in the form of virtual currency or fiat currency. *Id.* ¶ 21. The tokens are issued and distributed on a "blockchain" or cryptographically secured ledger. *Id.* ICOBox's offering of ICOS tokens constituted an ICO, as did the token sales of many of its clients. *Id.*[3]

***The ICOS offering.*** On July 27, 2017, ICOBox announced that it would be conducting an "ICO for ICOs," offering ICOS tokens to the general public from August 9, 2017 to September 15, 2017. *Id.* ¶ 27. ICOBox summarized the offering in a white paper dated August 2017 (the "White Paper"), which appeared on the company's website and social media channels. *Id.* ¶ 28. Before and during the offering, defendants promoted ICOS on social media; in online interviews; and via Evdokimov's appearances at crypto-enthusiast conferences. *Id.* ¶¶ 29-30.

ICOBox structured the sale of ICOS tokens in five consecutive phases. *Id.* ¶ 31. The cost per token increased over each phase, starting at 0.008 bitcoin on August 9, 2017, and increasing to 0.012 bitcoin during the final weeks of sale ending September 15, 2017 (*i.e.*, from $27 to $60 per token). *Id.* During the two "presale" phases, investors were required to purchase between 1,000 and 10,000 tokens, with

---

[3] On July 25, 2017, two weeks before ICOBox started its public sale of the ICOS tokens, the SEC issued a release titled the DAO Report, which "advise[d] those who would use . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws," and concluded that the digital assets at issue in that matter were securities. *Id.* ¶ 26.

1  the minimum purchase dropping to one ICOS token during the final phases. *Id.* ¶ 32.

2  ICOBox advertised ICOS as being available for purchase by the "public globally,"

3  including in the United States. *Id.* ¶ 33.

4      ICOBox did not impose sophistication or accreditation standards on investors,

5  and did not collect biographical information concerning its investors. *Id.* ¶ 34. It

6  accepted payments in the form of bitcoin, digital currency, and US dollars. *Id.* ¶ 35.

7  For every 100 ICOS tokens sold to investors, the White Paper stated that ICOBox

8  planned to issue 20 additional tokens for "distribution to partners, advisors, bounty

9  participants, and the team members." *Id.* ¶ 36. Throughout the offering, the

10  company provided a 5% "referral" bonus for investors who promoted ICOS. *Id.* ¶ 37.

11  There was no minimum or cap on the number of tokens that could be sold, nor the

12  amount that could be raised. *Id.* ¶ 38.

13      ***The project, as advertised.*** The White Paper stated that "[t]he essence of the

14  project is to raise funds by selling ICOS tokens." *Id.* ¶ 39. The primary use of

15  proceeds would be to fund ICOBox's provision of facilitation services to other ICO

16  issuers who could not afford its fees. *Id.* ICOBox charged flat fees starting at

17  $250,000 depending on the facilitation service package provided, and success fees

18  starting at 1.5% of the amount raised where the client's ICO went forward. *Id.* ¶ 40.

19      Prospective issuers agreed to make their future tokens available to ICOS token

20  holders, who could swap their ICOS tokens for an issuer's tokens at a discount. *Id.*

21  ¶ 41. According to the White Paper, if a prospective issuer could not afford

22  ICOBox's fees, the potential ICO would be "screened by ICOBox experts" to

23  determine if it met criteria sufficient to place the ICO on the ICOS platform—such as

24  "economic viability," "unique offer" and "team (visionary, team members'

25  competence and potential)." *Id.* ¶ 42. Once ICOBox experts decided which proposed

26  ICOs to place on the ICOS platform, ICOS holders would vote to select the ICOs

27  they believed should receive facilitation services paid for by the ICOS token sale. *Id.*

28      The White Paper projected that the ICOS platform would launch on

September 1, 2017, with the first voting and selection of new ICO projects to take place on October 2, 2017. *Id.* ¶ 43. ICOBox launched the ICOS platform on or about September 27, 2017, and the first voting and selection of new ICO projects occurred on or about October 15, 2017. *Id.* ¶ 44.

**Investors' expectations of profits from defendants' efforts.** ICOBox advertised that token holders could profit from discounts on the ICOS platform, and by trading ICOS tokens on digital asset platforms. *Id.* ¶ 45. The White Paper highlighted token holders' ability to profit by swapping their ICOS tokens at a roughly one-to-four rate for tokens that would be issued during future ICOs by ICOBox's clients. *Id.* ¶ 46. Defendants frequently cited this attribute of the tokens, claiming that token holders were "essentially getting an ICO discount pass." *Id.* ¶ 48. Evdokimov also claimed online that this facet of ICOBox's offering provided a "minimization of risks." *Id.* ¶ 49.

Defendants made numerous statements online and on social media, before and during the offering, about the large volume of anticipated ICOBox clients. *Id.* ¶ 51. According to the White Paper, ICOBox planned to conduct "about 800 ICOs" in its first year. *Id.* ¶ 52. ICOBox repeatedly emphasized during the offering that ICOS token holders would be able to profit by trading the ICOS tokens on digital asset platforms. *Id.* ¶ 55. ICOS tokens were ultimately listed on several digital asset trading platforms including HitBTC, EtherDelta, and Tidex. *Id.* ¶ 58.

**ICOS offering's success depended on management's efforts.** ICOBox made clear that its success depended on the efforts of its management team, and in particular on Evdokimov. *Id.* ¶ 59. For example, in a July 27, 2017 press release posted online, the company stated that "ICOBox was founded by . . . blockchain visionaries" including Evdokimov. In an interview posted on Crypto-economy.net on September 4, 2017, in the midst of the ICOS sale, Evdokimov described himself as having "founded numerous successful companies that conduct ICOs," and "written several books and articles on digital marketing and blockchain." *Id.* ¶ 60. ICOBox

5

claimed that its team had sufficient personnel to support the large volume of anticipated offerings.  *Id.* ¶ 62.

Although the White Paper stated that ICOS token holders would have the ability to "vote" and "comment" on proposed projects on ICOBox's platform, ICOBox in fact restricted the token holders' voting rights.  *Id*. ¶ 63.  Token holders could not vote on ICOs by potential clients who had the money to pay for ICOBox's facilitation services; instead, they could vote only on the subset of nonpaying potential clients' projects that already had been "screened by ICOBox experts" in what the White Paper referred to as an "initial audit."  *Id*. ¶ 64.  Token holders could not readily aggregate their votes, since the identities of ICOS token holders were not available, and management allocated itself and partners 20 tokens for every 100 issued to investors.  *Id*. ¶ 65.  Similarly, the comment feature was merely an informal mechanism for providing feedback to potential ICOBox clients.  *Id*. ¶ 66.

***Defendants' offers and sales of securities.***  Through its offering, ICOBox raised roughly $14.6 million from approximately 2,122 investors, including in the U.S., between August 9, 2017 and September 15, 2017.  *Id.* ¶ 67.  ICOBox, as the issuer of the tokens, directly offered and sold the ICOS tokens to investors through its website.  *Id.* ¶ 68.  Evdokimov also directly offered and sold the ICOS tokens.  *Id.* ¶ 69.  He held himself out as the company's founder and public face, and promoted the offering through ICOBox's website and in his social media presence.  *Id.*

The majority of the investors bought during the initial days of the ICO, with all but $600,000 of the $14.6 million raised by the end of August 2017.  *Id.* ¶ 71.  The company increased its social media pressure during the final days of the offering, sending messages on social media every few minutes.  *Id.* ¶ 72.  The average price paid per ICOS during the offering was $40/token.  *Id.* ¶ 73.  After the offering closed, on September 22, 2017, ICOBox issued 591,617 ICOS tokens on the Ethereum blockchain, which included the tokens issued to investors, referral bonus recipients, and the ICOBox team.  *Id.* ¶ 74.

*Defendants' failure to register the offering.* ICOBox took no steps to register the ICOS offering or qualify for any exemption, though defendants were well aware of the SEC's July 2017 DAO Report. *Id.* ¶ 75. In the days leading to the August 9, 2017 launch, Evdokimov gave interviews and made statements online about his interpretation of the DAO Report, incorrectly claiming that the ICOS offering was not a security or had an "exemption" from registration because the token had a "utility." Evdokimov did not say how this would constitute an exemption from the securities laws. *Id.* ¶ 76. Similarly, on Telegram, the company's management team received multiple questions from potential investors as to whether the company was able to offer the tokens to all US investors given the apparent application of the federal securities laws. *Id.* ¶ 77. Management responded that it could (and did) sell to U.S. investors, and that the company did not require information from purchasers to assess whether they were accredited. *Id.* ¶ 78.

In the two years after the ICOS offering, ICOBox has facilitated approximately 35 ICOs, far fewer than the 800 per year it forecasted. *Id.* ¶ 83. ICOBox recently announced it was discontinuing the platform for swapping ICOS tokens for deferred-payment clients, rendering the supposed discount "purchasing power" of the ICOS tokens obsolete. *Id.* ¶ 84. ICOS tokens have experienced a precipitous loss in value since their issuance on September 22, 2017. As of June 24, 2019, the tokens were worth at most approximately $2.41 per ICOS token, roughly 1/20th of the average purchase price during the offering (and roughly 1/30th the price paid by investors who purchased during the final days of the ICO). *Id.* ¶ 85.

## B.   Defendants' Unregistered Broker Services for Clients' ICOs

*ICOBox's "marketing services."* Since the ICOS offering in August 2017, ICOBox has facilitated approximately 35 clients launching ICOs, which have raised an estimated $650 million dollars from investors. *Id.* ¶ 85. ICOBox promoted itself as a "Blockchain Growth Promoter and Business Facilitator for companies seeking to sell their products via ICO crowdsales." *Id.* ¶ 87. The company provided various

services to foster clients' ICOs, such as "technology" (drafting smart contracts and developing online payment processing applications), "legal" (company formation and opinion letters through outside consultants), and "marketing." ICOBox offered services individually or in packages, such as the "Basic Package," which included a combination of the three categories. *Id.* ICOBox's "marketing" services, which it provided to at least 27 clients, included advising investors on the merits of the clients' offerings and actively soliciting investors to purchase the clients' tokens. *Id.* ¶ 89.

ICOBox charged two types of fees for marketing services: flat fees and success fees. *Id.* ¶ 91. The flat fee depended on the category and extent of the services, including, for example, the "Basic Package," which cost roughly $250,000. *Id.* ¶ 92. In addition, ICOBox charged "success" fees based on the amounts raised. *Id.* ¶ 93. The "success" fees, which were transaction-based compensation, ranged from 1.5% to 6% of the amount raised during the clients' ICOs. *Id.* ¶ 94.

At least one of the tokens sold by ICOBox's clients constituted securities: "PRGs," offered and sold by ICOBox client Paragon between August 2017 and October 2017. *Id.* ¶¶ 95-96. Paragon was an online entity formed in Singapore. *Id.* ¶ 97. It was involved in developing blockchain technology for the cannabis industry, and raised over $12 million through the sale of PRGs to the general public. *Id.* Paragon's whitepaper and other online promotional materials represented that Paragon would use the proceeds of its ICO to build a cannabis-related "ecosystem," the development of which would cause PRGs to rise in value. *Id.* ¶ 98. Paragon's representations led potential PRG investors to reasonably expect to profit from the efforts of Paragon's management. *Id.* ¶ 99. Paragon also promoted its efforts to control and increase the price of the PRGs, and its plans for PRGs to be placed on digital asset trading platforms. *Id.* ¶ 101. Paragon touted that its management's expertise would be responsible for the success of the venture and the PRGs' profitability. *Id.* ¶ 102.

On July 22, 2017, Paragon retained ICOBox to perform "marketing" services

in connection with the PRG offering, through a "Services Agreement" signed by an
ICOBox co-founder. *Id.* ¶ 103. As part of the agreement, ICOBox agreed to give
input on Paragon's whitepaper and to advise on the promotion of the ICO, including
in retaining team members, increasing online visibility of the offering, disseminating
promotional and offering materials regarding PRGs, attracting investors through
ICOBox's online and social media platforms, and communicating with potential
investors about the merits of the offering. *Id.* ¶ 104. Paragon agreed to pay ICOBox
a 3% success fee based on the amount raised, ultimately $12,066,000. *Id.* ¶ 105.

   ***Evdokimov's role.*** In his roles as ICOBox's co-founder, "vision director," and
CEO, Evdokimov managed ICOBox's operations, including overseeing and engaging
in the "marketing" services it provided. *Id.* ¶ 106. Evdokimov personally registered
ICOBox's website, the primary repository for attracting clients and the portal for
interested investors to obtain information about its clients' ICOs. *Id.* ¶ 107.
Evdokimov was active in soliciting clients for ICOBox's services online, on social
media, in interviews with crypto-enthusiast websites, and during appearances at
blockchain conferences. *Id.* ¶ 108. Evdokimov personally disseminated information
about ICOBox's clients' offerings to prospective investors through ICOBox's Twitter
account as well as his own Twitter account, "@neopotus." *Id.* ¶ 109. As to Paragon
in particular, Evdokimov discussed the merits of the offering with prospective
investors. *Id.* ¶ 110. For example, on ICOBox's Telegram channel on September 18,
2017, Evdokimov responded to claims by some posters that Paragon was a "scam,"
by saying: "No, Paragon is [sic] really good project with brilliant idea and perfect
team." *Id.* ¶ 111.

   **C.   Defendants' Current Status**

   ICOBox and Evdokimov have all but disappeared from the U.S. ICOBox is no
longer registered as a corporation with the Cayman Islands and its registered agent
for service of process has resigned with no replacement. Longo Decl. ¶¶ 11-13, Exs.
8-9. Its website, which was operational at the time the Complaint was filed, is no

longer accessible.  *Id.* ¶ 14.  After service of the Complaint was effected at ICOBox's office, the premises was vacated, with several months' rent left unpaid.  *Id.*  ¶¶ 4-5, 8, Ex. 5.  Efforts to email Evdokimov's last known address, neo@icobox.io, garnered no response (though no emails bounced back).  *Id.* ¶¶ 9-10, Exs. 6-7.

## III.   **ARGUMENT**

Fed. R. Civ. P. 55(b) provides for entry of a default judgment by the Court following entry of a default by the court clerk under Rule 55(a).  Fed. R. Civ. P. 55(b); *see also Kloepping v. Fireman's Fund*, 1996 U.S. Dist. LEXIS 1786, at *3-4 (N.D. Cal. Feb. 14, 1996).  Failure to timely answer a properly-served complaint will justify the entry of a default judgment.  *Benny v. Pipes*, 799 F.2d 489, 495 (9th Cir. 1986).  Entry of a default judgment is left to the Court's sound discretion.  *PepsiCo Inc. v. Triunfo-Mex. Inc*., 189 F.R.D. 431, 432 (C.D. Cal. 1999), citing *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  In *Eitel v. McCool*, the Ninth Circuit explained that a district court should consider the following factors in exercising its discretion: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  782 F.2d 1470, 1471-72 (9th Cir. 1986).  "In applying this discretionary standard, default judgments are more often granted than denied." *PepsiCo*, 189 F.R.D. at 432.

A party seeking a default judgment must state a claim upon which it may recover.  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002).  After default has been entered by the court clerk, all well-pled factual allegations of the complaint are taken as true, except for those relating to damages. *Id.,* citing *TeleVideo Sys., Inc. v. Heidenthal*, 826 F. 2d 915, 917 (9th Cir. 1987); *see also Benny*, 799 F.2d at 496; *T-Cetra, LLC v. Guzman*, No. CV 16-6416 DSF (AFMx), 2017 WL 7156250, at *1 (C.D. Cal. Dec. 15, 2017) (granting motion for

default judgment).  Along with the complaint, the court may look to affidavits and declarations to determine whether default judgment is appropriate.  *See* William W. Schwarzer *et al.,* California Practice Guide: Federal Civil Procedure Before Trial § 6:91 (2010).

## A.    The SEC Has Complied With Fed. R. Civ. P. 55(a) and L.R. 55-1

The SEC has satisfied the procedural requirements for a default judgment against ICOBox and Evdokimov under Fed. R. Civ. P. 55(a) and Local Rule 55-1. The SEC has: (1) served ICOBox and Evdokimov with the summons, complaint, notice of assignment, notice to parties of court directed alternative dispute resolution program and the initial standing order of United States District Judge Dale S. Fischer (Dkt. No. 9); (2) caused the clerk to enter defaults against ICOBox and Evdokimov for their failure to answer (Dkt. No. 11); (3) demonstrated that ICOBox and Evdokimov are neither minors nor incompetent; and (4) demonstrated that ICOBox and Evdokimov are not in the military or otherwise exempt under the Soldiers' and Sailors' Civil Relief Act of 1940.  *See* Longo Decl. ¶¶ 4-5, 9, 15-17.

The SEC served both defendants with the complaint in this action.  The SEC effected service on Evdokimov by personally delivering a copy to his wife and co-resident, Maria Batura, at his home, satisfying Fed. R. Civ. P. 4(e)(2)(B).[4]  The SEC also effected service on ICOBox through this personal delivery to Ms. Batura, the person apparently in charge of ICOBox's office at this address, followed by mailing the papers to ICOBox at this address.  *See* Longo Decl. ¶¶ 4-5; Fed. R. Civ. P. 4(h)(1)(B).[5]  ICOBox conducted business at the Beverly Hills address, including using it as the business address for the registration of its ICO website.  Longo Decl. ¶

---

[4] Rule 4(e)(2)(B) provides for service on an individual within a U.S. judicial district by "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there."

[5] Rule 4(h)(1)(B) provides for service on a corporation within a U.S. judicial district "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process . . . ."

6, Exs. 1-2.  Evdokimov and Batura also conducted other businesses out of this ICOBox office, which also served as their residence.  *Id.* ¶¶ 7-8, Exs. 3-4.  To augment defendants' receipt of notice of this lawsuit, the SEC further emailed a copy to Evdokimov's last known address, and received a receipt that the email was relayed.  Longo Decl. ¶¶ 9-10, Exs. 6-7.  The SEC also attempted to serve ICOBox through its managing agent for service of process in the Cayman Islands, but learned that ICOBox's agent had resigned, and the company was delisted, with no new agent appointed.  Longo Decl. ¶¶ 11-13, Exs. 8-9.

Courts have upheld service by personal delivery to a managing agent's spouse at the agent's residence.  *See, e.g., Wood v. Hampton-Porter Investment Bankers*, No. C-02-5367 MMC, 20014 WL 546888, at *2 (N.D. Cal. 2004) (entity effectively served where documents received by officer's wife at his home; default judgment entered); *McCarthy v. Langston*, 23 F.R.D. 249, 250 (N.D. Fl. 1959) (service on corporation president's wife effective where there was no indication she would not act in interest of company and plaintiff showed actual notice of lawsuit); *cf. Hakkasan LV, LLC v. Adamczyk*, No. 2:14-CV-01717, 2017 WL 1549508, at *2 (D. Nev. Apr. 5, 2017) (finding service on a corporate officer's mother insufficient).

Notice to ICOBox and Evdokimov of this motion and the relief requested are not required under Fed. R. Civ. P. 55(b)(2) and L.R. 55-1, because they have not appeared in this action in any capacity; however, the SEC has nevertheless provided notice of this motion to defendants.  Longo Decl. ¶ 20.  Additionally, because the SEC does not request relief that differs from or exceeds that prayed for in the complaint, the application for default judgment complies with Fed. R. Civ. P. 54(c).

### B.   The *Eitel* Factors Support Entry of Default Judgment

#### 1.   Possibility of prejudice to the SEC

The possibility of prejudice exists where "[i]f Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery." *PepsiCo*, 238 F. Supp. 2d at 1177; *see also Landstar Ranger, Inc. v. Parth*

*Enterprises, Inc.*, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010) (granting default judgment, where "[d]enying default judgment here would leave [plaintiff] without a proper remedy."). Here, the SEC seeks to enforce its remedies for defendants' registration violations. Absent a default judgment, the SEC would be without other recourse for relief unless it incurs substantial time and expense to proceed by a motion for summary judgment or by trial. The possibility of prejudice is enhanced by the fact that defendants have defaulted, thereby admitting the averments of the complaint. *See, e.g., SEC v. Wallace*, Case No. SACV 16-01788 AG (FFMx), 2017 WL 8230026, at *3 (C. D. Cal. May 8, 2017) ("The SEC's duty to enforce federal securities laws would be undermined if the Court were to allow [defendant] to escape liability simply by not responding to the case"); *SEC v. Newman*, CV 12-03142-BRO (PLAx), 2016 U.S. Dist. LEXIS 193639 (C.D. Cal. July 15, 2016) (same).

### 2.     Substantive merits and sufficiency of the complaint

Taken together, the second and third *Eitel* factors "require that a plaintiff state a claim on which [plaintiff] may recover." *PepsiCo*, 238 F. Supp. 2d at 1175 (citation omitted). Well-pleaded allegations are taken as admitted on a default judgment. *Benny*, 799 F.2d at 495. Here, the SEC's well-pled allegations establish that ICOBox and Evdokimov violated Securities Act Section 5 and Exchange Act Section 15(a).

***Section 5 violations.*** The SEC's allegations establish that defendants violated Sections 5(a) and 5(c) of the Securities Act. These registration provisions prohibit the unregistered offer and sale of securities in interstate commerce. *See Anderson v. Aurotek*, 774 F.2d 927, 929 (9th Cir. 1985); *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980). To establish a prima facie case, the SEC must show that defendants offered or sold securities, and that no registration was in effect or filed with the SEC for those securities. *See SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007); *SEC v.*

*Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972).[6]  All of these elements are met here.

Section 2(a)(1) of the Securities Act defines "security" to include "investment contracts."  An investment contract involves (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived from the efforts of others.  *See SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003); *SEC v. Blockvest, LLC*, No. 18-CV-2287-GPB(BLM), 2019 WL 625163, at *5 (S.D. Cal. Feb. 14, 2019).  The *Howey* test is an "'objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'"  *Blockvest*, 2019 WL 625163, at *5 (citing *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009)).  The ICOS tokens were "securities" under this test.

First, an investment in ICOS tokens required an investment of money, in both U.S. dollars and various digital assets.  *See, e.g., U.S. v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *5 (E.D.N.Y. Sept. 11, 2018) (investment of a virtual currency, and other forms of payment, in a token constitutes an investment of money under *Howey*).  More than 2,000 purchasers invested $14.6 million in various forms in the ICOS offering, through ICOBox's website.

Second, ICOS tokens were investments in a common enterprise.  In the Ninth Circuit, this element is satisfied by either horizontal commonality (pooling of investor funds and interests) or strict vertical commonality (the fortunes of the investors are linked with those of the promoter).  *See SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991).  Here, horizontal commonality existed because ICOS investors' funds were pooled to support ICOBox's provision of facilitation services to clients.  In addition, strict vertical commonality was present due to the direct

---

[6] The offers or sales must also be in interstate commerce.  Here, defendants offered and sold the ICOS tokens to investors worldwide through means of interstate commerce through its website and social media on Internet pages available globally.

correlation between the fortunes of ICOS holders and of ICOBox's management. *See, e.g., SEC v. Eurobond Exch., Ltd*., 13 F.3d 1334, 1339-40 (9th Cir. 1994).  The fortunes of the ICOS holders were linked to ICOBox's management's ability to identify, attract, and facilitate offerings, and to thereby generate discounted investment opportunities and returns on secondary markets for the investors, as well as fees for the company and its management.  *See id*. at 1340 (strict vertical commonality existed where "[t]he investor's success . . . was correlated with the financial stability of Eurobond").

Third, ICOS purchasers had a reasonable expectation of profits derived from defendants' managerial efforts.  Based on defendants' representations, token purchasers could reasonably anticipate profits in the form of significant discounts on future ICO tokens, and could expect the ICOS token to increase in value based on ICOBox's planned use of the proceeds to grow the business and attract future clients. The promise of trading by ICOS tokens on secondary trading platforms further bolstered those reasonable expectations.

Section 5 imposes liability on persons who "directly or indirectly" offer or sell securities.  Liability is "not confined only to the person who passes title to the security" (*Murphy*, 626 F.2d at 649; *see also SEC v. Rogers*, 790 F.2d 1450, 1456 (9th Cir. 1986)); rather, in addition to those who directly sell, liability reaches those who are "both a 'necessary participant' and 'substantial factor' in the sales transaction[s]."  *Phan*, 500 F.3d at 906; *see also Murphy*, 626 F.2d at 648-49, 651-52. The Ninth Circuit has interpreted this to mean that "but for the defendant's participation, the sale transaction would not have taken place" and that the defendant's acts were not *de minimis*.  *See Murphy*, 626 F.2d at 651-52*; see also Rogers*, 790 F.2d at 1456; *SEC v. CMKM Diamonds*, 729 F.3d 1248, 1255 (9th Cir. 2013) (indirect seller's role in the transaction must be "significant").

Here, both defendants directly offered and sold ICOS tokens.  ICOBox was the tokens' issuer.  Evdokimov, who held himself out as the company's founder and

public face, directly promoted the offering online through the ICOBox website (registered in his name), through social media accounts, and in interviews to crypto-focused media.  Evdokimov also indirectly sold ICOS tokens, as a necessary participant and substantial factor in the sales.

Once the SEC establishes a *prima facie* Section 5 violation, defendants bear the burden of proving that an exemption to the registration requirement applies.  *SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010), *citing SEC v. Murphy*, 626 F.2d at 641.  Having failed to answer the complaint, defendants have made no such showing.

**Section 15 violations.**  Section 15(a) of the Exchange Act makes it unlawful for any broker "to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in . . . any security . . . unless such broker . . . is registered" in accordance with Section 15(b) of the Exchange Act.  "Section 15(a) is a strict liability statute; neither scienter nor negligence is required to prove its violation."  *SEC v. Qi*, No. CV 17-08856-CJC(JCX), 2018 WL 5263187, at *7 (C.D. Cal. Mar. 21, 2018).  "The purpose of Section 15(a)'s broker registration requirement is to ensure that 'securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells.'"  *SEC v. Hui Feng*, No. 15-CV-09420, 2017 WL 6551107, at *6 (C.D. Cal. Aug. 10, 2017) (citation omitted), a*ff'd SEC v. Hui Feng*, 935 F.3d 721 (9th Cir. 2019).

Exchange Act Section 3(a)(4) defines a "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others."  Courts generally consider whether the defendant's conduct "may be characterized by a 'certain regularity of participation in securities transactions at key points in the chain of distribution.'"  *SEC v. Benger*, 697 F. Supp. 2d 932, 944-45 (N.D. Ill. 2010) (citations omitted).  Pertinent factors include: (1) receiving transaction-based compensation; (2) selling or previously selling the securities of

1   other issuers; (3) involvement in negotiations between the issuer and the investor; (4)

2   advertising for clients; (5) advising or making valuations as to the merits of the

3   investment; and (6) actively rather than passively soliciting and finding investors.

4   *See SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984); *Feng,* 935 F.3d

5   721.

6        Both defendants acted as unregistered brokers.  They actively solicited

7   investors for their clients, including Paragon, by advertising the offerings on

8   ICOBox's website and social media accounts, sharing their clients' promotional

9   materials, white papers, and links to their websites for placing investments, and

10  publicizing their clients' offerings through crypto-focused publications and review

11  sites.  They advised potential investors about the merits of the clients' tokens, and

12  enabled ICOS token holders to swap for the clients' new tokens through their

13  platform, thereby acting as the link between the issuers and the investors.  Defendants

14  charged transaction-based compensation in the form of "success" fees tied to the

15  amount of funds raised from investors in client ICOs.

16       Because the well-pleaded allegations of the complaint establish defendants'

17  liability for selling unregistered securities and acting as unregistered brokers, the

18  second and third *Eitel* factors favor entry of default judgment.

19              **3.    Amount at stake and seriousness of defendants' conduct**

20       For the fourth *Eitel* factor, "the court must consider the amount of money at

21  stake in relation to the seriousness of Defendant's conduct."  *PepsiCo*, 238 F. Supp.

22  2d at 1176.  Here, defendants raised $14.6 million in their unregistered offering,

23  which the SEC seeks by disgorgement.  This factor favors default judgment.

24              **4.    Possibility of disputed facts**

25       The fifth *Eitel* factor considers the possibility of a dispute as to any material

26  facts in the case.  Upon entry of default, all well-pleaded facts in the complaint are

27  taken as true, except those relating to damages.  *TeleVideo*, 826 F.2d at 917-18

28  (citations and quotations omitted).  As explained above, the Complaint's allegations

1    establish that defendants violated the federal securities laws; if litigated, those

2    allegations would be supported by substantial evidence.  ICOBox and Evdokimov,

3    who are not represented by counsel and have not appeared nor responded to the

4    SEC's claims against them, have not and will be unable to refute this evidence.  *See,*

5    *e.g., SEC v. Baccam*, No. ED CV 17-0172 SJO (SPx), 2017 WL 5952168, at *7 (C.D.

6    Cal. June 14, 2017) (granting default judgment where "the SEC filed a well-pleaded

7    Complaint alleging facts sufficient to prevail on its claims").

8                    **5.    Possibility of excusable neglect**

9            The sixth *Eitel* factor considers the possibility that the default resulted from

10    excusable neglect.  Due process requires that all interested parties be given notice

11    reasonably calculated to apprise them of the pendency of the action and be afforded

12    an opportunity to present their objections before a final judgment is rendered.

13    *Mullane v. Central Hanover Trust Co*., 339 U.S. 306, 314 (1950).  "The possibility of

14    excusable neglect is remote where the defendant is provided proper notice of the

15    pending suit, but does not contact the court or the plaintiff in any manner."  *Baccam*,

16    2017 WL 5952168, at *8 (citing *Phillip Morris USA, Inc. v. Castworld Prods., Inc*.,

17    219 F.R.D. 494, 501 (C.D. Cal. 2003)).  Here, the SEC served ICOBox and

18    Evdokimov at his residence, which served as one of ICOBox's offices, through

19    service on his wife, with whom he conducted joint business at this address.  Longo

20    Decl. ¶¶ 4-8, Exs. 1-5.  The SEC attempted to serve ICOBox at its former registered

21    agent for service of process, only to find that it had de-registered.  *Id.* ¶¶ 11-13,

22    Exs. 8-9.  The SEC also emailed defendants regarding this lawsuit, but heard no

23    response.  *Id.* ¶¶ 9-10, Exs. 6-7.  Because ICOBox is not represented by counsel, it is

24    not able to appear in the action under L.R. 83-2.2.2.  The notice defendants have

25    received, combined with their inaction since the action was filed on September 18,

26    2019, preclude them from showing any possibility of excusable neglect.

27                    **6.    Policy for deciding on the merits**

28            The mere existence of Fed. R. Civ. P. 55(b) suggests that the seventh *Eitel*

                                        18

factor, a preference for deciding matters on their merits, is not alone dispositive. *PepsiCo*, 238 F. Supp. 2d at 1177. Indeed, the "Defendant's failure to answer [the] Complaint makes a decision on the merits impractical, if not impossible." *Id*. Therefore, the seventh *Eitel* factor should not preclude the Court from entering a default judgment against ICOBox and Evdokimov.

### C.   The SEC Is Entitled to the Relief it Seeks

In its Complaint, the SEC sought a judgment: (1) permanently enjoining ICOBox and Evdokimov from future violations of Securities Act Sections 5(a) and (c), and Exchange Act Section 15(a); (2) ordering disgorgement of ill-gotten gains with prejudgment interest; and (3) imposing civil penalties. Because the SEC has shown that default judgment is warranted, the Court should order the relief requested herein.

#### 1.   ICOBox and Evdokimov should be permanently enjoined

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1), provide that upon proper showing, a permanent injunction shall be granted in an enforcement action brought by the SEC. To obtain an injunction, the SEC must establish that there is a reasonable likelihood of future violations. *See Murphy*, 626 F.2d at 655. Whether a likelihood of future violations exists depends upon the totality of the circumstances. *Id*. The existence of past violations may give rise to an inference that there will be future violations. *See id*.; *see also U.S. v. Odessa Union Warehouse Coop*., 833 F.2d 172, 176 (9th Cir. 1987) (citing *SEC v. Koracorp Industries, Inc*., 575 F.2d 692, 698 (9th Cir. 1978)). Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of the conduct, the likelihood, because of the defendant's professional occupation, that future violations may occur, and the sincerity of the defendant's assurances against future violations. *See Murphy*, 626 F.2d at 655; *Koracorp*, 575 F.2d at 698.

A reasonable likelihood exists that, absent a permanent injunction, defendants

may commit future securities violations.  The SEC's complaint—the allegations of which are taken as true for purposes of this motion—reflect that ICOBox raised $14.6 million in an unregistered securities offering, and charged fees for their facilitation of the sales of other securities offerings, with at least reckless disregard of the requirement to register ICOBox's securities and to register or associate with a broker.  By failing to file an answer or otherwise participate in this action, and by apparently fleeing the jurisdiction, defendants have declined to offer this Court any assurances that they will not commit violations of the federal securities laws.  Nor have they acknowledged the wrongful nature of their conduct.  *See, e.g., Baccam*, 2017 WL 5952168, at *9 (awarding injunctive relief by default, noting that the defendant "has not given any assurances against future violations, but to the contrary, declined to appear in this case").  Accordingly, this Court should issue a judgment permanently enjoining ICOBox and Evdokimov from future violations of Securities Act Sections 5(a), (c) and Exchange Act Section 15(a).

### 2.   The Court should order joint and several disgorgement with prejudgment interest

In the Ninth Circuit, it is well-settled that this Court has "'broad equity powers to order the disgorgement of ill-gotten gains'" obtained through a defendant's violation of the securities laws.  *Platforms Wireless*, 617 F.3d at 1096.  "'Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable.'"  *Id*.; *SEC v. JT Wallenbrock & Associates*, 440 F.3d 1109, 1113 (9th Cir. 2006).

In contrast to damages, which are designed to compensate fraud victims, disgorgement forces a defendant to surrender his unjust enrichment and thus serves to reduce the incentive to violate the law.  *See SEC v. Rind*, 991 F.2d 1486, 1491-93 (9th Cir. 1993).  Therefore, "'[t]he amount of disgorgement should include all gains flowing from the illegal activities.'"  *Platforms Wireless*, 617 F.3d at 1096 (quoting *JT Wallenbrock*, 440 F.3d at 1114).  For example, in *Platforms Wireless*, the Ninth

1   Circuit affirmed the district court's order that the defendants disgorge all of the

2   proceeds obtained from their illegal and unregistered offerings.  *See id*. at 1097; *see*

3   *also SEC v. Cross Financial Services*, *Inc*., 908 F. Supp. 718, 734 (C.D. Cal. 1995)

4   (defendant ordered to disgorge net receipts from investors in fraudulent offering of

5   notes).  When seeking disgorgement, the SEC only needs to present evidence of a

6   "reasonable approximation" of the defendant's ill-gotten gains.  *Platforms Wireless*,

7   617 F.3d at 1096.  Once the SEC has made that showing, the burden shifts to the

8   defendant to "'demonstrate that the disgorgement figure was not a reasonable

9   approximation.'"  *Id*. (quoting *SEC v. First City Financial Corp*., *Ltd*., 890 F.2d

10  1215, 1232 (D.C. Cir. 1989)).  This burden, as the Ninth Circuit explained, rightfully

11  belongs to the wrongdoer:

12         We place this burden on the defendants because information
       is not "obtainable at negligible cost."  The defendants are
13     more likely than the SEC to have access to evidence
       [demonstrating that the SEC's approximation is not
14     reasonable]….  [W]e conclude that "the risk of uncertainty
       should fall on the wrongdoer whose illegal conduct created
15     that uncertainty."

16  *Id*. (quoting *First City Financial*, 890 F.2d at 1231, 1232).  "If defendant does not

17  contest the amount prayed for in the complaint and the claim is for a sum certain or a

18  sum that can be made certain by computation, the judgment generally will be entered

19  for that amount without any further hearing.  Indeed, if defendant is in default for

20  failing to appear . . ., the clerk may enter the judgment for that amount and assess

21  costs against defendant without any judicial hearing."  10A Charles Wright, Arthur

22  Miller & Mary Kane, Federal Practice & Procedure § 2688 (3d ed. 2010).  It is also

23  well-established that the principal of an entity may be held jointly and severally liable

24  for an order of disgorgement against the entity.  *See JT Wallenbrock*, 440 F.3d at

25  1111-13; *Platforms Wireless*, 617 F.3d at 1099.

26         In the case of an illegal offering, "it [i]s appropriate for the district court to

27  order [defendants] to disgorge the proceeds received in connection with the …

28  offering."  *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

In the Ninth Circuit, it is well- established that the proper disgorgement amount equals the total amount of proceeds raised in an offering fraud from investors, less whatever was paid back to investors.  *See JT Wallenbrock*, 440 F.3d at 1111-13 (affirming disgorgement of $139.4 million, representing "the entire proceeds from the scheme less amounts paid to investors"); *Platforms Wireless*, 617 F.3d at 1096-97 (affirming disgorgement of about $1.75 million, the total "amount of proceeds obtained from" illegal offering); *see also SEC v. Schooler*, 106 F. Supp. 3d 1157, 1169 (S.D. Cal. 2015) (awarding disgorgement of the amount raised less the amount returned to investors for Section 5 violations, rejecting effort to distinguish *Wallenbrock* and *Platforms Wireless* on the grounds that they involved fraud, noting that "disgorgement is still an appropriate remedy in this case even in the absence of fraud"), *rev'd and  remanded in part on other grounds*, 905 F.3d 1107 (9th Cir. 2018).  Joint and several disgorgement is appropriate given Evdokimov's close association with ICOBox and role as its principal.  *See Platforms Wireless*, 617 F.3d at 1097-98 (joint and several liability for disgorgement warranted when co-defendants collaborated or "act[ed] collectively" in violating securities laws); *see also J.T. Wallenbrock*, 440 F.3d at 1116-17.

The SEC has alleged in the Complaint and presented evidence with this motion that defendants raised $14.6 million through their unregistered securities offering.  *See* Longo Decl. ¶¶ 21-24, Exs. 10-13.  This includes defendants' 2200+ investor list, showing the amounts of digital currency invested in ICOS, and their public proclamations of the amount they raised.  *Id.*  The SEC has thus presented evidence demonstrating a "reasonable approximation" of defendants' ill-gotten gains, which defendants have not contested.  Accordingly, $14.6 million is the appropriate disgorgement.

Defendants should also pay prejudgment interest on the disgorgement amount. Disgorgement normally includes prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity.  *See Cross Financial Services*, 908 F. Supp.

1    at 734.  An award of prejudgment interest is designed to deprive the wrongdoer of the

2    benefit of "what amounts to an interest free loan procured as a result of illegal

3    activity."  *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  Prejudgment

4    interest on $14.6 million from September 15, 2017 through September 17, 2019 is

5    $1,459,428.99.  *See* Longo Decl. ¶¶ 25-26, Ex. 14.  Thus, the total amount of

6    disgorgement and prejudgment interest that should be assessed jointly and severally

7    against defendants is $16,059,428.99.

8            **3.     The Court should order second tier penalties against**

9                     **Evdokimov**

10           Civil penalties are meant to punish wrongdoers and to deter them and others

11   from future securities law violations.  *See SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d

12   1, 17 (D.C. Cir. 1998).  Under Section 20(d)(2)(A) of the Securities Act and Section

13   21(d)(3)(B) of the Exchange Act, the amount of any civil penalty "shall be

14   determined by the court in light of the facts and circumstances."  15 U.S.C. §§

15   77t(d)(2)(A), 78u(d)(3)(B).  Because civil penalties, like permanent injunctions, are

16   imposed to deter the wrongdoer from similar conduct in the future, in assessing civil

17   penalties, courts frequently apply the factors set forth in *SEC v. Murphy*, 626 F.2d

18   633 (9th Cir. 1980), used to establish the need for injunctive relief.  *See*, *e.g.*, *SEC v.*

19   *Abacus Int'l Holding Corp.*, 2001 U.S. Dist. LEXIS 12635, at *15 (N.D. Cal. Aug.

20   16, 2001).  Those factors include: (i) the degree of scienter involved; (ii) the isolated

21   or recurrent nature of the infraction; (iii) the defendant's recognition of the wrongful

22   nature of the conduct; (iv) the likelihood, because of the defendant's professional

23   occupation, that future violations might occur; and (v) the sincerity of any assurances

24   against future violations.  *See Murphy*, 626 F.2d at 655.

25           Here, the *Murphy* factors support statutory second-tier[7] civil monetary

26

27   _____

     [7] The Securities Act and the Exchange Act provide that penalties should be assessed
     according to a three-tier system.  *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). Second-
28   tier penalties apply to violations that "involved fraud, deceit, manipulation or

penalties against Evdokimov for each of his violations.[8]  Evdokimov acted with at least reckless disregard of the registration requirements for the ICOS tokens, and for ICOBox's broker activities.  Evdokimov assured investors there was no need for ICOBox to register with the SEC, despite his public statements regarding the DAO Report.  ICOS tokens' value has declined precipitously since defendants sold them to the public, and by not registering the offering with the SEC, defendants deprived investors of the kinds of information about the offering that an SEC registration statement would have afforded them.  Since he has defaulted, Evdokimov has provided no evidence of any inability to pay such an award—nor any evidence of his financial condition whatsoever—further warranting the recommended penalty.  *See, e.g., SEC v. Souza*, 2011 WL 2181365, at *3 (E.D. Cal. June 3, 2011) (imposing penalty by default judgment motion, "in order to adequately serve the deterrent function of the civil penalty provision").

### D.   Default Judgment Should be Entered Without Delay

Fed. R. Civ. P. 54(b) provides that "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  Thus, where delay is necessary to avoid an inconsistent result as to similarly situated defendants, Fed. R. Civ. P. Rule 54(b) requires deferring the entry of default judgment.  *See First T.D. & Investment, Inc.*, 253 F.3d 520, 532 (9th Cir. 2001) (reversing entry of default judgments on a legal theory that was rejected by the court as to answering defendants in the same action), citing *Frow v. De La Vega*, 82 U.S. 552 (1872).  Because both defendants have failed to answer the SEC's complaint, and ICOBox cannot, without counsel, appear and defend this enforcement action, the Court should enter final

---

deliberate or reckless disregard of a regulatory requirement." *Id*. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii).  Each tier provides that a penalty cannot exceed the greater of either a specific statutory amount, or "the gross amount of pecuniary gain to such defendant as the result of the violation." *Id*. §§ 77t(d)(2), 78u(d)(3)(B).
[8] The SEC waives its request for penalties against ICOBox.

judgment at this time against both defendants.

## IV.    **CONCLUSION**

     For the foregoing reasons, plaintiff SEC respectfully requests that the Court grant its motion for entry of default judgment, and impose the requested relief.

Dated:  January 9, 2020                                Respectfully submitted,

                                         */s/ Amy Jane Longo*

                                         Amy Jane Longo
                                         Brent Wilner
                                         Attorney for Plaintiff
                                         Securities and Exchange Commission

# **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

      U.S. SECURITIES AND EXCHANGE COMMISSION,
      444 S. Flower Street, Suite 900, Los Angeles, California 90071
      Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On January 9, 2020, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS ICOBOX AND NIKOLAY EVDOKIMOV** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

      ☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

      ☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☐    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

      I declare under penalty of perjury that the foregoing is true and correct.

Date:  January 9, 2020                */s/ Amy Jane Longo*
                                    Amy Jane Longo

1

***SEC v. ICOBox, et al.***
**United States District Court—Central District of California**
**Case No. 2:19-cv-08066-DSF-Ex**

### SERVICE LIST

ICOBox
neo@icobox.io
***Pro Se Defendant***


Nikolay Evdokimov
neo@icobox.io
***Pro Se Defendant***

2